**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROJECT FOR PRIVACY AND
SURVEILLANCE ACCOUNTABILITY,
INC.,

                Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
JUSTICE, *et al.*,

                Defendants.

Civil Action No. 20-3657 (BAH)

Chief Judge Beryl A. Howell

### MEMORANDUM OPINION

Plaintiff Project for Privacy and Surveillance Accountability, Inc. filed this lawsuit against five federal agencies—namely, the U.S. Department of Justice ("DOJ"), Office of the Director of National Intelligence ("ODNI"),  National Security Agency ("NSA"), Central Intelligence Agency ("CIA"), and U.S. Department of State ("DOS")—challenging the agencies' responses to plaintiff's record requests, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking records "on the unmasking and upstreaming—including requests for unmasking or upstreaming—of [48] current and former members of congressional intelligence committees."  Compl. ¶ 26, ECF No. 1.  Relying on information leaked to the media regarding the unmasking of U.S. lawmakers in intelligence reports, plaintiff argues that the "frequency of such undisclosed surveillance indicates that unmaskings may have been requested for illegitimate reasons—for example, to gain information to embarrass or compromise members of congressional committees responsible for overseeing the intelligence community."  Compl. ¶ 23. All five defendant agencies, as well as DOJ's component, the Federal Bureau of Investigation ("FBI"), issued *Glomar* responses that neither confirmed nor denied the existence of records

1

responsive to plaintiff's request.  *See* Defs.' Statement of Material Facts Not in Dispute ("Defs.' SMF") ¶¶ 6–7, 9, 11, 13, 15, 17, 19, ECF No. 11.  Plaintiff challenges these *Glomar* responses and further contends that defendants should have conducted searches for non-protected records before issuing their *Glomar* responses.  The parties have now cross moved for summary judgment and, for the reasons explained below, defendants' motion for summary judgment, Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 11, is granted and plaintiff's cross-motion for summary judgment, Pl.'s Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 15, is denied.[1]

## I.     BACKGROUND

Set out below is a brief review of plaintiff's FOIA requests and pertinent procedural history, as well as background for the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801–1885c, helpful to understanding the context for both the FOIA requests and responses at issue.

### A.      Plaintiff's FOIA Requests

On January 27 and 28, 2020, plaintiff, a non-profit corporation that "advocates for greater privacy and civil liberty protections from government surveillance," Compl. ¶ 5, submitted substantially similar FOIA requests to DOJ, FBI, ODNI, NSA, CIA, and DOS.  Compl. ¶¶ 27, 33, 38, 44, 50, 55.  The FOIA requests sought two categories of "documents, reports, memoranda, or communications" emerging from surveillance under the FISA: (1) "regarding the unmasking—including all unmasking requests—of any [of the 48 listed current and former members of congressional intelligence committees] from January 1, 2008 to January 15, 2020";

---

[1]       A similar challenge to the same defendants' *Glomar* responses to FOIA requests for records related to the unmasking and upstreaming of certain high-profile individuals made by the instant plaintiff's counsel, Gene C. Schaerr, was previously rejected by another Judge on this Court.  In *Schaerr v. U.S. Dep't of Justice*, 435 F. Supp. 3d 99 (D.D.C. 2020), *appeal filed* Case No. 21-5165 (D.C. Cir. 2021), Judge Amy Berman Jackson held that the defendants' *Glomar* responses were justified under FOIA Exemptions 1 and 3 and rejected allegations by plaintiff Schaerr that unmaskings may have been requested in bad faith, *id.* at 105–120.

and (2) "regarding the upstreaming—including all requests for upstreaming of any [of the same

48 current and former Congress members]" from the same time period.  Compl. ¶¶ 27, 33, 38,

44, 50, 55.[2]

Four of the six recipients of plaintiff's FOIA requests denied the requests and issued

*Glomar* responses before the initiation of this litigation.  On Feb. 4, 2020, ODNI provided a

*Glomar* response under FOIA Exemptions 1 and 3, indicating that "[t]he fact of the existence or

non-existence of the requested records is itself currently and properly classified, and could reveal

intelligence sources and methods information that is protected from disclosure pursuant to

Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1)."

Compl. ¶ 34; *id*., Ex. G, Letter from Sally A. Nicholson, Chief, FOIA Branch, ODNI, to Gene

Schaerr (Feb. 4, 2020) ("ODNI Denial Letter"), ECF No. 1-8.  NSA denied the plaintiff's FOIA

request under the same exemptions on Feb. 12, 2020, *id*. ¶ 39; *id*., Ex. M, Letter from John R.

Chapman, Chief, NSA FOIA/PA Off., to Gene Schaerr (Feb. 12, 2020) ("NSA Denial Letter"),

ECF No. 1-14.  DOJ's National Security Division ("NSD") denied plaintiff's FOIA request on

Feb. 18, 2020, issuing a *Glomar* response under FOIA Exemption 1, *id*.  ¶ 29; *id*., Ex. C, Letter

from Arnetta Mallory, DOJ Government Information Specialist, to Gene Schaerr (Feb. 18, 2020)

("DOJ Denial Letter"), ECF No. 1-4, while the FBI denied plaintiff's FOIA request on June 22,

2020, issuing a *Glomar* response under FOIA Exemptions 1, 3, 6, 7(C) and 7(E), *id*. ¶ 46; *id*., Ex.

---

[2]        The 48 current and former members of congressional intelligence committees include: Rep. Adam Schiff;
Rep. Jim Himes; Rep. Terri Sewell; Rep. Andre Carson; Rep. Jackie Speier; Rep. Mike Quigley; Rep. Eric
Swalwell; Rep. Joaquin Castro; Rep. Denny Heck; Rep. Peter Welch; Rep. Sean Patrick Maloney; Rep. Val
Demings; Rep. Raj Krishnamoorthi; Rep. Devin Nunes; Rep. Mike Conaway; Rep. Michael Turner; Rep. Brad
Wenstrup; Rep. Chris Stewart; Rep. Rick Crawford; Rep. Elise Stefanik; Rep. Will Hurd; Rep. John Ratcliffe; Sen.
James Risch; Sen. Marco Rubio; Sen. Susan Collins; Sen. Roy Blunt; Sen. Tom Cotton; Sen. John Cornyn; Sen. Ben
Sasse; Sen. Dianne Feinstein; Sen. Ron Wyden; Sen. Martin Heinrich; Sen. Angus King; Sen. Kamala Harris; Sen.
Michael Bennet; Sen. James Lankford; Sen. Mark Warner; Rep. Peter King; former Rep. Frank LoBiondo; former
Rep. Trey Gowdy; former Rep. Tom Rooney; former Rep. Ileana Ros-Lehtinen; former Rep. Jeff Miller;. former
Rep. Lynn Westmoreland; former Rep. Joe Heck; former Rep. Mike Pompeo; former Rep. Luis Gutierrez; and
former Rep. Patrick Murphy. Compl. ¶ 26.

T, Letter from Michael G. Seidel, Acting Section Chief, Record/Information Dissemination

Section, Information Management Div., FBI, to Gene Schaerr (June 22, 2020)  ("FBI Denial

Letter"), ECF No. 1-21.

The denial letters declined to "confirm nor deny the existence of records responsive to

[the plaintiff's] request." FBI Denial Letter at 2; ODNI Denial Letter at 2.  The NSD elaborated

that, for FOIA requests regarding "operational files which document requests for and approvals

of authority for the U.S. Intelligence Community to conduct certain foreign intelligence

activities," NSD does not search those records when the "confirmation or denial of the existence

of responsive records" would reveal classified information.  NSD Denial Letter at 3.  NSA

explained in its denial letter that "NSA collects and provides intelligence derived from foreign

communications to policymakers, military commanders, and law enforcement officials" in order

to "help these individuals" protect the national security of the United States and its allies.  NSA

Denial Letter at 3.

Plaintiff timely appealed the NSD, FBI, and ODNI denials of its FOIA requests, and all

three denials were affirmed.  *See* Decl. of Patrick N. Findlay, General Counsel, NSD ("NSD

Decl."), ECF No. 11-5; Decl. of Michael G. Seidel, Section Chief, Record/Info. Dissemination

Section, Info. Mgmt. Div., FBI ("FBI Decl."), ECF No. 11-4; Decl. of Gregory M. Koch, Chief,

Info. Mgmt. Off., ODNI ("ODNI Decl."), ECF No. 11-7.  Rather than appeal NSA's denial of its

January 2020 request, plaintiff submitted another FOIA request to this agency, on August 20,

2020, that attached a letter by then-Acting Director of National Intelligence Richard Grenell to

Senate Select Intelligence Committee Vice Chairman Mark Warner, justifying Grenell's decision

to declassify the identities of federal officials who sought to unmask the identity of General

Flynn in intelligence reports.  Compl. ¶ 40; *id.*, Ex. N, Letter from Gene Schaerr, General

Counsel, Project for Privacy & Surveillance Accountability, to NSA (Aug. 20, 2020), ECF No. 1-15.  NSA declined to process the August 2020 request due to its prior response, but upon plaintiff's appeal of that declination, which was granted, NSA issued a new *Glomar* response to plaintiff's August 2020 request as well.  *See id.*, Ex. O, Letter from Sharon C. Linkous, Acting Chief, FOIA/PA Off., NSA, to Schaerr (Sept. 1, 2020), ECF No. 1-16; *id.,* Ex. P, Letter from Schaerr to NSA/CSS FOIA/PA Appeal Authority (Oct. 9, 2020), ECF No. 1-17; Decl. of Linda M. Kiyosaki, Chief of Policy, Info., Performance, and Exports, NSA ("NSA Decl.") ¶¶ 16–17, ECF No. 11-2.

Although DOS and CIA acknowledged receipt of plaintiff's requests, these two agencies did not reply to the plaintiff's requests until May 28, 2021 and May 14, 2021, respectively, after this litigation had been initiated, when they issued *Glomar* responses on the basis of FOIA Exemptions 1 and 3.  Compl. ¶¶ 51–53, 56–58; Defs.' SMF ¶¶ 17, 19; Pl.'s Response to Defs.' SMF & Pl.'s Counter-Statement of Material Facts Not in Dispute ("Pl.'s Resp. SMF") ¶¶ 17, 19, ECF No. 15.

### B.      Incidental Surveillance of U.S. Persons under FISA

FISA provides the Attorney General and Director of National Intelligence with legal authorization for use of surveillance tools for "foreign intelligence purposes."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).  The statute is tailored to minimize domestic surveillance, requiring that targets be "foreign power[s] or [] agent[s] of a foreign power," 50 U.S.C. § 1804(a)(3)(A), or, in the case of FISA surveillance authorized by Section 702, targets must be "reasonably believed to be located outside the United States to acquire foreign intelligence information." 50 U.S.C. § 1881a(a).[3]  Under Section 702, the Attorney General and

---

[3]      FISA § 702, enacted as part of the FISA Amendments Act of 2008, 122 Stat. 2436, "supplement[ed] pre-existing FISA authority by creating a new framework under which the Government may seek the [Foreign

DNI may neither intentionally target any person within the United States, nor "United States persons"—defined, *inter alia*, to include citizens and lawful permanent residents, 50 U.S.C. § 1801(i)— outside of the country.  *Id.* at § 1881a(b)(1)–(3).  Still, information about U.S. persons may be incidentally collected by surveillance conducted under FISA.

       1.    *Masking*

Information collected under FISA-authorized surveillance is subject to minimization procedures designed to "minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons." *Id.* at § 1801(h)(1); *see also* § 1881a(e)(1).  One of those procedures involves "masking" the identity of U.S. persons included in intelligence reports with generic phrases such as "a named U.S. person."  FBI Decl. ¶ 15.  Generally, however, government officials may request that an anonymized person be revealed—called "unmasking"—if the information "constitutes foreign intelligence, is necessary for the recipient to understand the foreign intelligence being transmitted, or is evidence of a crime."  *Id.*  The unmasking process is subject to strict documentation requirements.  *See* ODNI, INTEL. CMTY. POL'Y GUIDANCE 107.1, REQUESTS FOR IDENTITIES OF U.S. PERSONS IN DISSEMINATED INTELLIGENCE REPORTS (Jan. 11, 2018), https://www.dni.gov/files/documents/ICPG/ICPG-107.1.pdf.

The first part of plaintiff's FOIA requests seek information about requests to "unmask[]" current and former members of congressional intelligence committees in the context of reports disseminated within the U.S. government and derived from FISA surveillance.  Compl. ¶ 17. Plaintiff points to a 2017 article in *The Hill* as evidence of potential abuse by the intelligence

---

Intelligence Surveillance Court's] authorization of certain foreign intelligence surveillance targeting the communications of non-U.S. persons located abroad.  Unlike traditional FISA surveillance, § 1881a does not require the Government to demonstrate probable cause that the target of the electronic surveillance is a foreign power or agent of a foreign power." *Clapper*, 568 U.S. at 404.

community of this unmasking power, citing information in the article that the communications of U.S. lawmakers and their staff were incidentally collected as often as monthly, and their unmasked names appeared frequently in executive branch intelligence reports. *Id.* ¶ 22.  The frequency of the unmasking of U.S. lawmakers has prompted plaintiff to speculate that "unmaskings may have been requested for illegitimate reasons," such as embarrassing members of congressional oversight committees. *Id*. ¶ 23.

### 2.    *Upstreaming*

NSA is authorized, under FISA § 702, *inter alia*, to collect target communications "as they cross the backbone of the internet with the compelled assistance of companies that maintain those networks" in a process called "upstream collection."  FBI Decl. ¶ 17.[4]  This approach contrasts with "downstream collection," where NSA and other intelligence agencies collect information directly from the U.S. company that services the target account, such as Google or Facebook.  In addition to collecting communications sent or received by a target, upstream collection also obtains information merely "about" targets—increasing the likelihood that the NSA may collect communications involving non-consenting U.S. persons who are not themselves surveillance targets nor in communication with them. *Id.*[5]

Plaintiff describes upstreaming as the process of searching for an individual's name within the vast amount of data that NSA accumulates.  Compl. ¶ 21.  Defendants, on the other

---

[4]     According to official public disclosures, only NSA conducts upstream collection. *See* FBI Decl. ¶ 18.

[5]     Although NSA publicly announced on April 28, 2017 that "its Section 702 foreign intelligence surveillance activities will no longer include any upstream internet communications that are solely 'about' a foreign intelligence target," NSA, NSA STOPS CERTAIN SECTION 702 "UPSTREAM" ACTIVITIES (April 28, 2017), https://www.nsa.gov/Press-Room/Press-Releases-Statements/Press-Release-View/Article/1618699/nsa-stops-certain-section-702-upstream-activities/ (last accessed Sept. 13, 2022), the FBI's declaration explaining upstreaming suggests that "about" collection continued as of the date of the declaration. *See* FBI Decl. ¶ 17 (citing document published on April 18, 2017, shortly before ODNI's public announcement of the end of "about" collection). The FBI declarant's reliance on such an outdated, five-year old document to suggest continuation today of the "about" collection may reflect sloppy drafting rather than call into question the accuracy of NSA's public announcement.

hand, take a broader approach to the concept of upstreaming, interpreting part two of plaintiff's requests as seeking "documents regarding the collection of communications to, from, or about the 48 listed individuals, using the 'Upstream' technique." NSA Decl. ¶ 22.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* FED. R. CIV. P. 56(a). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)). Most FOIA cases "can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army* ("*DiBacco I*"), 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)). Agencies are therefore statutorily mandated to "make . . . records promptly available to any person" who submits a request that "reasonably describes such records" and "is made in accordance with [the agency's] published rules." 5 U.S.C. § 552(a)(3)(A). To balance the public's interest in governmental transparency and "legitimate governmental and private interests [that] could be harmed by release of certain types of

information," *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019)

(quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), FOIA contains nine exemptions, set forth

in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'"

*Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79

(1973); and then quoting *Abramson*, 456 U.S. at 630); *see also Citizens for Resp. & Ethics in*

*Wash. v. U.S. Dep't of Justice ("CREW I")*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).  "[T]hese

limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant

objective of the Act."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts "to enjoin the agency from withholding agency records

and to order the production of any agency records improperly withheld from the complainant."  5

U.S.C. § 552(a)(4)(B).  When an agency invokes an exemption to disclosure, district courts must

"determine *de novo* whether non-disclosure was permissible."  *Elec. Priv. Info. Ctr. v. U.S. Dep't*

*of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015).  The statute "places the burden 'on the

agency to sustain its action,' and the agency therefore bears the burden of proving that it has not

'improperly' withheld the requested records."  *CREW. v. U.S. Dep't of Justice ("CREW II")*, 922

F.3d 480, 487 (D.C. Cir. 2019) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S.*

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also U.S. Dep't of Justice v.*

*Landano*, 508 U.S. 165, 171 (1993) ("The Government bears the burden of establishing that the

exemption applies."); *DiBacco v. U.S. Dep't of Army ("DiBacco II")*, 926 F.3d 827, 834 (D.C.

Cir. 2019) ("'An agency withholding responsive documents from a FOIA release bears the

burden of proving the applicability of claimed exemptions,' typically through affidavit or

declaration." (quoting *DiBacco I*, 795 F.3d at 195)).  This burden does not shift even when the

requester files a cross-motion for summary judgment because the agency ultimately "bears the

burden to establish the applicability of a claimed exemption to any records or portions of records it seeks to withhold," *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016), while "[t]he burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

The agency may sustain its burden through a *Vaughn* index, and supporting affidavits or declarations, that "describe[ ] the justifications for withholding the information with specific detail, demonstrate[ ] that the information withheld logically falls within the claimed exemption, and [are] not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *DiBacco II*, 926 F.3d at 834 (quoting *DiBacco I*, 795 F.3d at 196); *CREW I*, 746 F.3d at 1088; *see also Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 150 (D.D.C. 2018) ("An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate."). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (quoting *Am. Civil Liberties Union v. U.S. Dep't of Def. (ACLU/DOD)*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

## III.    DISCUSSION

Plaintiff challenges all five defendants' comprehensive *Glomar* responses, arguing that each of the four FOIA exemptions relied upon are inadequate to justify either withholding or a

refusal to search for responsive records.  Following discussion of the use of *Glomar* responses in the legal framework governing disclosure under FOIA, applicability of the exemptions invoked by defendants are analyzed.

### A.    *Glomar* Responses Generally

"In certain cases, merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception.'" *People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  In such cases, "an agency can issue a *Glomar* response, refusing to confirm or deny its possession of responsive documents." *Id*.  To determine whether acknowledging the existence or non-existence of responsive records satisfies a FOIA exemption, "courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374; *accord Am. Civil Liberties Union v. CIA (ACLU/CIA)*, 710 F.3d 422, 426 (D.C. Cir. 2013). Thus, the agency bears the burden of showing that the fact of whether the requested records are in the agency's possession is a fact protected from disclosure under a FOIA exemption.  *See Wolf*, 473 F.3d at 374.  "In *Glomar* cases, courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'"  *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Gardels v. CIA*, 689 F.2d 110, 1105 (D.C. Cir. 1982)).

When an agency withholds records requested under FOIA, the supporting affidavits need not justify the agency's withholdings "document-by-document." *CREW I*, 746 F.3d 1082, 1088. Instead, when the process of litigating a FOIA request "threatens to reveal 'the very information the agency hopes to protect' . . . it may be necessary for the agency affidavit to contain only

'brief or categorical descriptions' of the withheld information." *Id.* (quoting *ACLU/CIA*, 710 F.3d at 432).  An agency may justify the withholding of records on a categorical basis when the "range of circumstances included in the category characteristically support[s] an inference that the statutory requirements for exemption are satisfied." *Id.* (alteration in original) (quoting *Nation Magazine v. U.S. Customs Serv.,* 71 F.3d 885, 893 (D.C. Cir. 1995)).

A *Glomar* response may be challenged in at least two related ways. First, a plaintiff may challenge the agency's assertion of an exemption, that is, whether confirming or denying the existence of requested records would result in "harm cognizable under [a] FOIA exception." *Wolf*, 473 F.3d at 374 (quoting *Gardels*, 689 F.2d at 1103); *see also, e.g., People for the Ethical Treatment of Animals*, 745 F.3d at 540. Second, a plaintiff may show that not "all of the responsive records were covered by the [claimed] Exemption." *Elec. Privacy Info. Ctr.*, 678 F.3d at 934;  *see also Jefferson v. Dep't of Justice*, 284 F.3d 172, 179–80 (D.C. Cir. 2002) (holding that the Justice Department's Office of Professional Responsibility was not entitled to make a *Glomar* response as to "all records" pertaining to a particular Assistant U.S. Attorney when it did not meet its burden to prove all records were compiled for law enforcement purposes such that they fell within Exemption 7(C)).  Plaintiff employs both methods to challenge the agencies' *Glomar* responses here.

Specifically, plaintiff contests the invoked exemptions, arguing that defendants "fail[ed] to meet their burden of justifying their *Glomar*-based refusal even to *search* for responsive records."  Pl.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n.") at 22, ECF No. 15 (as to Exemption 1); *see also id.* at 32–33 (as to Exemption 3); *id.* at 35 (as to Exemption 7).   The D.C. Circuit has repeatedly held, however, that when an agency issues a *Glomar* response, no search for responsive documents needs to be undertaken.  A

*Glomar* response "narrows the FOIA issue to the existence of records *vel non*." *Wolf*, 473 F.3d at 374 n.4. Thus, in this context, "requiring [the agency] to conduct a search and segregability analysis would be a meaningless—not to mention costly—exercise." *Elec. Privacy Info. Ctr.*, 678 F.3d at 934; *see also Carter v. NSA*, No. 13-5322, 2014 WL 2178708, at *1 (D.C. Cir. 2014) (per curiam); *Schaerr*, 435 F. Supp. 3d at 116 (rejecting plaintiff's argument that defendants "should at least be required to do a search for the documents" before issuing a *Glomar* response because conducting a search still risks "potential harm caused by merely revealing the records' existence").

Although a search need not be conducted before issuing a *Glomar* response, an agency must "make a threshold showing that the FOIA request seeks records [that fall within the claimed exemption]." *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 64 (D.C. Cir. 2018). Whether defendants meet that burden will be addressed within the following discussion of the applicability of each exemption.

### B.   *Glomar* Responses Properly Invoke Exemption 1.

DOJ (including the FBI), ODNI, NSA, CIA, and State Department each invoked Exemption 1 to support their *Glomar* responses.  Exemption 1 protects from disclosure records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy, and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1); *see Milner*, 562 U.S. at 580 (noting that among the "tools at hand to shield national security information and other sensitive materials," the government has "[m]ost notably, Exemption 1 of FOIA [which] prevents access to classified documents."); *see also Larson v. Dep't of State*, 565 F.3d 857, 861 (D.C. Cir. 2009).  Thus, an agency invoking Exemption 1 must show that the withheld information has been classified in

compliance with the classification procedures set forth in the relevant executive order and that only information conforming to the executive order's substantive criteria for classification has been withheld. *See Judicial Watch*, 715 F.3d at 941 (discussing "substantive and procedural criteria for classification"); *Lesar v. Dep't of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980) ("To be classified properly, a document must be classified in accordance with the procedural criteria of the governing Executive Order as well as its substantive terms.").

"The D.C. Circuit has advised courts to accord substantial deference to an agency's *Glomar* response and avoid 'searching judicial review' when the information requested 'implicat[es] national security, a uniquely executive purview.'" *Schaerr*, 435 F. Supp. 3d at 111 (alteration in original) (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 926–27 (D.C. Cir. 2003)); *see also Elec. Privacy Info. Ctr.*, 678 F.3d at 931.  Generally, "an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf*, 473 F.3d at 374–75 (quoting *Gardels*, 689 F.2d at 1105).

In this case, defendants have sufficiently established that the existence or non-existence of responsive records is classified under Executive Order ("E.O.") 13,526, which is "the operative classification order under Exemption 1, [that] sets forth both substantive and procedural criteria for classification." *Judicial Watch*, 715 F.3d at 941; *see also* E.O. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).  An agency may "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under [the Order] or its predecessors."  E.O. 13,526 § 3.6(a).  This E.O. sets forth four requirements for the classification of national security information: (1) "an original classification authority is classifying the information," (2) the information is "owned by, produced by or for, or is under the control of the United States Government," (3) the information pertains to one of

14

eight subject-matter classification categories, and (4) disclosure of the information "reasonably could be expected to result in damage to the national security" that is both describable and identifiable. *Id.* at § 1.1(a)*; see also Judicial Watch, Inc.,* 715 F.3d at 941.

Plaintiff raises both substantive and procedural challenges to defendants' invocation of Exemption 1, which are addressed *seriatim.*

### 1.    *Procedural Requirements*

In plaintiff's view, defendants "cannot refuse to confirm or deny the existence of requested records unless 'the fact of [the records'] existence is itself classified under [E.O. 13,526],'"  Pl.'s Opp'n at 24 (first alteration in original) (quoting E.O. 13,526 § 3.6(a)), and here, defendants failed to prove that they completed "all the procedural steps to actually classify [the withheld information] before issuing their *Glomar* response,"  *id.* at 25.  Plaintiff reasons that the intangible nature of what defendants call a "*Glomar* fact," Defs.' Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Summ. J. ("Defs.' Opp'n"), at 8, ECF No. 17, does not absolve an agency from Exemption 1's second criterion that the matter be "*in fact properly classified* pursuant" to an executive order,  Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 10, ECF No. 21 (emphasis in the original) (quoting 5 U.S.C. § 552(b)(1)(A)); *see also id.* at 11 (noting that E.O. 13,526 does not exempt *Glomar* facts from the procedural requirements of the classification process).[6]  Those missing procedural steps, according to plaintiff, include failing to (1) mark the withheld information with declassification instructions, (2) comply with special procedures for classifying information after receiving a FOIA request under E.O. 13,526 §

---

[6] The defendants' memorandum is docketed twice, once at ECF No. 17 and once at ECF No. 18. To simplify citation, only the memorandum docketed at ECF No. 17 is cited.

1.7(d), and (3) comply with unspecified "transparency procedures" required by the Order.  Pl.'s

Opp'n at 25.[7]

This Court has considered and rejected the plaintiff's exact argument in *Mobley v. CIA*,

924 F. Supp. 2d 24, 47–50 (D.D.C. 2013), *aff'd on other grounds*, 806 F.3d 568 (D.C. Cir. 2015),

and *Nat'l Sec. Couns. v. CIA*, No. 12-cv-284, 2016 WL 6684182, \*19 (D.D.C. Nov. 14, 2016).

In *Mobley*, while noting that plaintiff's view that the CIA's *Glomar* response was procedurally

unsound found some support in the text of E.O. 13,526, *Mobley*, 924 F. Supp. 2d at 48, the Court

ultimately relied on the D.C. Circuit's interpretation of the identical provision in a predecessor

Executive Order to hold that "if the agency affidavit plausibly explains the danger of the

expected damage to national security or foreign relations from confirming or denying the

existence of records, the existence of records *vel non* is properly classified under Executive

Order 12958 and justifies the Agency's invocation of Exemption 1," *id.* at 50 (cleaned up)

(quoting *Wolf*, 473 F.3d 375–76).

Plaintiff acknowledges that this Court has already thoroughly considered and rejected this

argument twice, but urges reconsideration on four grounds.  First, plaintiff contends that E.O.

13,526 "pointedly imposes the same classification requirements on [*Glomar*] responses without

any hint of exception."  Pl.'s Reply at 14 (citing E.O. 13,526 § 3.6(a)).  As this Court held in

---

[7]     Plaintiff does not challenge that individuals with the proper classification authority under E.O. 13,526 have
determined that the information at issue is classified; rather, the plaintiff challenges those "*post hoc* determinations"
as failing to follow the "many other procedural requirements scattered throughout the order" to classify that
information properly.  Pl.'s Opp'n at 24–25.  To establish the propriety of their *Glomar* responses, defendants
submitted declarations by officials designated as original classification authorities at all six responding agencies.
*See* NSA Decl. ¶ 1 (providing an 18-page explanation by the NSA's Chief of Policy, Information, Performance, and
Exports, Linda M. Kiyosaki); FBI Decl. ¶ 2 (providing a 22-page explanation by FBI Record/Information
Dissemination Section Chief, Michael Seidel); NSD Decl. at 6, n.5 (providing a 10-page explanation by Justice
Department National Security Division General Counsel, Patrick Findlay); ODNI Decl. ¶ 3 (providing a 12-page
explanation by ODNI Information Management Office Chief Gregory Koch); Decl. of Vanna Blaine, Information
Review Officer, CIA ("CIA Decl.") ¶ 2 (providing an 11-page explanation); Decl. of Victor Raphael, Deputy
Assistant Secretary for Analysis and Production, Bureau of Intelligence and Research, State Dep't ("DOS Decl.") ¶
1 (providing a 10-page explanation).

*Mobley,* however, the Order did not appear to contemplate the fundamental nature of a *Glomar* response, which the plaintiff agrees is an "intangible form[] of classified information." Pl.'s Reply at 13 (quoting *Mobley*, 924 F. Supp. 2d at 49). The Executive Order, in interchangeably using the words "document," "record," and "information" to refer to national security information, signaled an "implicit assumption that all classified information is in a tangible form." *Mobley*, 924 F. Supp. 2d at 49. *See, e.g.,* E.O. 13,526 §1.6.

Second, plaintiff contends that defendants could comply with the Order's procedural criteria, such as providing necessary markings, because *Glomar* responses do create tangible records—"including, at the very least, either or both of the original FOIA requests . . . and the agency's *Glomar* letter to the requester." Pl.'s Reply at 15. In this argument, plaintiff misses the mark: the Order requires that "each classified document" be marked with information as to the level of classification and portion of the document classified. *See* E.O. 13,526 §1.6(c). FOIA requests and *Glomar* letters may be tangible, but are not themselves classified documents. Marking them would not satisfy the procedural requirements of the Order; only marking the concededly intangible *Glomar* fact would do so—a metaphysical impossibility.

Third, plaintiff contends that *Mobley* misconstrued the D.C. Circuit's holding in *Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007), because the parties in that case did not contest whether the procedural requirements of the controlling Executive Order were satisfied. Pl.'s Reply at 15. The conclusion in *Mobley*, however, did not rest solely on *Wolf* and, thus, regardless of whether *Wolf* squarely resolved the issue, the "language and structure of the Order [E.O. 13,526] itself," *Mobley*, 924 F. Supp. 2d at 50, was found to support the conclusion.

Finally, plaintiff contends that, where the D.C. Circuit has previously upheld information as properly classified under Exemption 1 despite procedural flaws, those cases involved

17

relatively "minor" violations of the procedural requirements of E.O. 13,526.  Pl.'s Reply at 16.

The D.C. Circuit has held that defects in the original classification procedure do not necessitate

release, because such a rule "could have intolerable consequences for national security interests."

*Lesar*, 636 F.2d at 484–85 (holding that some "procedural violations . . . may be of such

importance to reflect adversely on the agency's overall classification decision, requiring a

remand to the district court for *in camera* inspection; while others may be insignificant,

undermining not at all the agency's classification decision").  Although "this does not mean that

only conformity with the EO's substantive requirements is required . . . [s]o long as procedural

violations do not undermine the agency's decision to classify—as when, for example, a

procedural violation suggests that, contrary to the EO, classification was undertaken in order to

conceal a violation of law—the Court will not order documents to be released on that ground."

*Judicial Watch, Inc. v. U.S. Dep't of Defense*, 857 F. Supp. 2d 44, 58–59 (D.C. Cir. 2012).

Plaintiff does not allege that any failure of the agencies to follow E.O. 13,526's procedural

requirements indicates a cover-up "to conceal a violation of law," and therefore falls short of

establishing that a procedural failure here obviates reliance on Exemption 1, when any

procedural failings of the classification of the *Glomar* facts at issue in this case result instead

from the peculiarities of *Glomar* responses.  *See generally* Pl.'s Reply at 10–16.

### 2. *Substantive Requirements*

The crux of plaintiff's substantive challenge to defendants' *Glomar* responses turns on

the fourth requirement of § 1.1(a) of E.O. 13,526, that "the declarations [of the government]

establish the requisite level of harm." *Judicial Watch*, 715 F.3d at 941; *see also* E.O. 13,526 §

1.1(a)(4) (requiring that "unauthorized disclosure of the information reasonably could be

expected to result in damage to the national security, which includes defense against

transnational terrorism, and the original classification authority is able to identify or describe the damage").[8]  Defendants have submitted six declarations describing the potential harm to national security that would arise from the disclosure of the existence or non-existence of documents related to the unmasking or upstreaming of the 48 identified lawmakers.  Each declarant explained that acknowledging the existence of records related to unmasking and upstreaming of the named individuals would reveal both whether those individuals' communications were intercepted through FISA surveillance, and whether they were identified in intelligence reports during the requested time period.  Disclosing such information would tip off the intelligence community's adversaries to its "priorities, capabilities, activities, and methods."  Decl. of Vanna Blaine, Information Review Officer, CIA ("CIA Decl.") ¶ 16. *See also* NSA Decl. ¶ 24; FBI Decl. ¶ 36; NSD Decl. ¶ 20; Decl. of Victor Raphael, Deputy Assistant Secretary for Analysis and Production, Bureau of Intelligence and Research, State Dep't ("DOS Decl.") ¶ 9; ODNI Decl. ¶ 25.

As to plaintiff's requests for records regarding the unmasking of the named lawmakers, the confirmation of the existence (or not) of any of these records would reveal whether information about the named individuals has been collected pursuant to FISA and appeared in subsequent, FISA-sourced intelligence reports.  *See* Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 15, ECF No. 11.  This information would, "in effect, tend to confirm the existence or nonexistence of broader U.S. Government intelligence interest in and/or activity regarding a

---

[8]     Plaintiff does not contest defendants' assertion that the third element of E.O. 13,526 § 1.1(a), requiring that "the information falls within one or more of the categories of information listed in section 1.4," is satisfied.  The agencies' declarants rely on section 1.4(c) of E.O. 13,526, which permits classification of information "pertain[ing] to…intelligence activities (including covert action), intelligence sources or methods, or cryptology," to establish that the requested records are properly classified and exempt under Exemption 1 of FOIA. *See* DOS Decl. ¶ 9; CIA Decl. ¶ 13 (also citing a category including "foreign relations or foreign activities of the United States, including confidential sources" (quoting E.O. 13,526 § 1.4(d))); NSA Decl. ¶ 20; FBI Decl. ¶ 26; NSD Decl. ¶ 14; ODNI Decl. ¶ 23.

particular subject." CIA Decl. ¶ 16.  Further, acknowledging that these individuals were the target or otherwise had their communications incidentally targeted by FISA surveillance "could give targets, their cohorts, foreign intelligence agencies, and others intent on interfering with NSD's and its partner's investigative efforts information necessary to take defensive actions to conceal criminal activities, develop and implement countermeasures to elude detection." NSD Decl. ¶ 20.  At the same time, confirming the non-existence of unmasking records about a particular individual could "identif[y] an area in which ODNI and the [intelligence community] have a lack of interest in the subjects or an inability to obtain information on the individuals or entities of interest and potentially confirms the success of any evasive techniques." ODNI Decl. ¶ 24.

Defendants' declarants identified many of the same risks in confirming or denying upstreaming-related records about the named lawmakers pursuant to the second part of the plaintiff's requests.  Such records would similarly identify whether the individuals' communications were collected pursuant to FISA-authorized surveillance and whether the intelligence community took a particular interest—or lack of interest—in the individual.  Further, confirming or denying the existence of records regarding the upstreaming of any of the named individuals would "plainly reveal whether the [NSA] had collected communications to, from, or about the 48 specific individuals listed in the requests, using 'Upstream' collection, a particular intelligence method." NSA Decl. ¶ 22.  As a result, disclosure "reasonably could be expected to cause exceptionally grave damage to the national security by providing . . . adversaries a guide or 'road map' that instructs them on which communication modes or personnel remain secure and which are susceptible to NSA's capabilities." *Id.* ¶ 25.  As to the non-NSA defendants, responding to the upstreaming request would require confirmation or denial that these agencies

even utilize information derived from upstream collection at all, since "[o]fficial public

disclosures by the [ODNI] acknowledge only that NSA engages in upstream collection." FBI

Decl. ¶ 18; *see also* DOS Decl. ¶ 14 (further noting that a response to the upstreaming

information requests would "provide information about how intelligence is shared, analyzed, and

used throughout the [intelligence community]").

Notwithstanding the agencies' thorough explanations of the national security risks,

plaintiff contends, to the contrary, that the disclosure of the existence of at least some of the

requested records "cannot reasonably be expected to cause identifiable and describable damage

to national security."  Pl.'s Opp'n at 25.  More specifically, plaintiff argues that defendants may

possess *some* disclosable records responsive to its requests that are "not animated by national

security concerns at all," and thus, defendants must search for records that cannot fall within the

protection of a blanket *Glomar* response.  Pl.'s Reply at 21.  To support this claim, plaintiff relies

on: (1) the intelligence community's systematized disclosures of congressional unmaskings to

certain members of Congress, (2) news reports of intelligence community members spying on

lawmakers, and (3) the 2020 declassification of the names of officials who sought to unmask

former National Security Advisor Michael Flynn in intelligence reports.  *See* Pl.'s Opp'n at 25–

32; Pl.'s Reply at 19–21.

For the reasons already stated, *see supra* § III.A, plaintiff's arguments that defendants are

required to search for responsive documents before issuing a *Glomar* response fail under clear

D.C. Circuit precedent. *See, e.g., People for the Ethical Treatment of Animals*, 745 F.3d at 540

("[T]o the extent the circumstances justify a *Glomar* response, the agency need not conduct any

search for responsive documents or perform any analysis to identify segregable portions of such

documents." (first citing *Wolf*, 473 F.3d at 374 n.4; then citing *Elec. Privacy Info. Ctr.*, 678 F.3d at 934)).

Equally unavailing is plaintiff's assertion that some responsive records to the FOIA requests may fall outside of the protection of Exemption 1 because the records may not endanger national security if disclosed.  On this question, "[i]n light of the substantial weight accorded agency assertions of potential harm made in order to invoke the protection of FOIA Exemption 1," the agencies' declarations are sufficiently "logical[]" and "plausibl[e]" to overcome the plaintiff's speculation.  *Wolf*, 473 F.3d at 376.  To be sure, summary judgment is only appropriate "if this information [provided by an agency's affidavit] is not contradicted in the record, and if there is no evidence in the record of agency bad faith . . . .  The sufficiency of the affidavits is not undermined by a mere allegation of agency misrepresentation or bad faith, nor by past agency misconduct in other unrelated cases."  *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir. 1979).  Plaintiff's examples of what it contends to be bad behavior on the part of the intelligence community—such as the CIA's reported 2014 hacking into the Senate Intelligence Committee's network while the latter prepared a report on the agency's detention and interrogation program, *see* Pl.'s Opp'n at 31—constitute unrelated past agency misconduct, failing to cast into doubt the plausibility of the agencies' declarations in this case.

With those arguments aside, plaintiff's remaining challenges to the substantive requirements of Exemption 1 may be easily dispatched.  Plaintiff argues that disclosure of the responsive records would not harm national security because "since at least 1991, the fact of the IC's ongoing acquisition and dissemination of so-called 'Congressional identity information' has been repeatedly acknowledged and widely publicized."  Pl.'s Opp'n at 26.  As examples, plaintiff cites procedures originally drafted by CIA Director Robert Gates in 1992 that governed

the unmasking of members of Congress or their staff in intelligence reports, which procedures

have subsequently been revised, incorporated into formal intelligence community policy, and

declassified.  *See id.*; Pl.'s Opp'n., Ex. 3, Announcement of Gates Procedures Declassification,

ECF No. 15-3 (declassifying and explaining the Gates Memo).  The thrust of this argument is

that the government has already "repeatedly acknowledged and widely publicized" the existence

of the requested information, compelling disclosure even over an otherwise valid exemption

claim.  Pl.'s Opp'n at 26.  This argument overstates the situation here. The mere "[p]rior

disclosure of similar information does not suffice."  *Wolf*, 473 F.3d at 378.  Instead, "the

information requested must be as specific as the information previously released; [and] the

information requested must match the information previously disclosed . . . ." *ACLU/DOD*, 628

F.3d at 620–621 (first citing *Wolf*, 473 F.3d at 378; then citing *Fitzgibbon v. CIA*, 911 F.2d 755,

765 (D.C. Cir. 1990)).  Further, in order to fall within this exception, the requested information

must be "in the public domain." *ACLU/DOD*, 628 F.3d at 621 (quoting *Wolf*, 473 F.3d at 378).

Plaintiff has not sought records that would reveal the intelligence community's *procedures*

governing the dissemination of intelligence reports containing unmasked identities of members

of Congress; rather, the plaintiff seeks records about the unmasking of specific lawmakers over a

specific period of time, revealing whether these lawmakers in particular had communications

collected through FISA surveillance.  The information that the plaintiff seeks neither "match[es]"

nor is "as specific" as the information previously released in the Gates Memo and its subsequent

iterations.  *Id.* at 620.

    Relatedly, plaintiff cites the Gates Memo's multi-factor balancing test governing the

disclosure of unmasking requests to Congress as proof undermining "any categorical assertion

that confirming or denying the mere existence of even a single responsive record would

necessarily cause damage to national security." Pl.'s Opp'n at 27. The argument goes that, if the intelligence community considers informing Congress sometimes necessary when its members are unmasked in intelligence reports, then the publication of information regarding the unmasking of these named lawmakers cannot be a threat to national security. Defendants correctly criticize this argument for failing to distinguish between Congress and the public. *See* Defs.' Opp'n at 17. Disclosure of incidences of unmasking to a select set of members of Congress does not place that information into the "public domain." *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) (holding that the display of photographs to members of the U.N. Security Council did not constitute "release[] to the general public"); *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) (equating information "in the public domain" with information that is "publicly available").

Another problem with this argument is that the Supreme Court has held that "members of the Intelligence Community have the 'power to withhold superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source.'" *Shapiro v. Dep't of Justice*, No. 12-cv-313 (BAH), 2020 WL 3615511, *24 (D.D.C. July 2, 2020) (quoting *CIA v. Sims*, 471 U.S. 159, 178 (1985)). "Minor details of intelligence information may reveal more information than their apparent insignificance suggests because, 'much like a piece of jigsaw puzzle, [each detail] may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself.'" *Agility Public Warehousing Co. K.S.C. v. Nat'l Sec. Agency*, 113 F. Supp. 3d 313, 328–29 (D.D.C. 2015) (quoting *Larson*, 565 F.3d at 864).

Next, plaintiff points to former Acting Director of National Intelligence Richard Grenell's decision to declassify the identifies of federal officials who requested the unmasking of former National Security Advisor Michael Flynn as evidence that "it is possible to both acknowledge and even publicize unmasking records without damaging national security."  Pl.'s Opp'n at 28.  As a result, plaintiff contends, at least some of the records responsive to its FOIA requests must fall within the same category of declassifiable records.  Here, too, the already-disclosed information does not "match," *ACLU/DOD*, 628 F.3d at 620, the information that plaintiff seeks.  Grenell revealed the identities of those who sought to unmask one particular governmental official over the course of about three months on the basis of the particularized context of "serious unanswered questions about the potential misuse of intelligence for partisan purposes following the 2016 election." Defs.' Opp'n at 18 (quoting Pl.'s Opp'n, Ex. 9, Letter from Richard Grenell, Acting Dir. of Nat'l Intel., to Hon. Mark Warner, Vice Chairman, Senate Select Comm. on Intel. (May 25, 2020) ("Grenell Letter") at 1, ECF No. 15-9).  By contrast, plaintiff seeks records that would reveal whether 48 individuals were unmasked over the course of about twelve years.  The obvious mismatch speaks for itself.

In sum, all defendants properly relied on Exemption 1 for their *Glomar* responses.

### C.    *Glomar* Responses under Exemption 3.

All defendants, except DOJ, also justify their *Glomar* responses under FOIA Exemption 3, which covers "matters 'specifically exempted from disclosure by statute,' provided that such statute leaves no discretion on disclosure or 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'" *Larson,* 565 F.3d at 861 (quoting 5 U.S.C. § 552(b)(3)).  The defendant agencies' declarations identified the statute excluding the requested information as the National Security Act of 1947, 50 U.S.C. § 3024.  CIA Decl. ¶ 12; NSA Decl.

25

¶ 33; ODNI Decl. ¶ 28; DOS Decl. ¶ 21; FBI Decl. ¶¶ 38–44.  This provision protects

"intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).

Plaintiff's challenges to Exemption 3 mirror the arguments made in opposition to Exemption 1,

and fail for the same reasons. [9]

### D.     *Glomar* Responses under Exemptions 7(A), 7(C), and 7(E)

In addition to Exemption 1, DOJ alternatively relied on Exemption 7 to justify its *Glomar*

response, with component FBI invoking Exemption 7(E), NSD invoking 7(A), and both invoking

7(C). [10]  Although defendants' invocation of Exemptions 1 and 3 suffice to merit summary

judgment in their favor, plaintiff's challenges to Exemption 7 are considered in turn, beginning

with the applicability of the exemption, which concerns "records or information compiled for

law enforcement purposes," 5 U.S.C. § 552(b)(7), to plaintiff's FOIA requests.

As a threshold issue, plaintiff contends that the requested records do not qualify as

protected law enforcement records.  *See* Pl.'s Opp'n at 35–36.  This argument is also the

---

[9]        NSA also relies on two additional statutory provisions as support for withholding under Exemption 3: (1) Section 6 of the National Security Act of 1959 (codified at 50 U.S.C. § 3605), which provides that "[n]othing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof . . ."; and  (2)  a criminal statute, 18 U.S.C. § 798, which prohibits a person from knowingly and willfully disclosing "any classified information . . . concerning the communication intelligence activities of the United States . . . or . . . obtained by the processes of communication intelligence from the communications of any foreign government, knowing the same to have been obtained by such processes."  Both statutes qualify as Exemption 3 statutes. *See Larson*, 565 F.3d at 868; *Linder v. NSA*, 94 F.3d 693, 698 (D.C. Cir. 1996). NSA argues that, with respect to Section 6 of the National Security Act, revealing the existence of the requested records would "reveal information about NSA's mission and activities, including its sensitive sources and methods." Defs.' Mem. at 19.  As to 18 U.S.C. § 798, acknowledging the existence of the requested records would "reveal the exact type of information (i.e., communications intelligence) that Section 798 was intended to protect." *Id*. at 19–20; *see* 18 U.S.C. § 798.  The sufficiency of these alternative bases need not be addressed since Section 102A(i)(1) of the National Security Act provides ample support for the propriety of the NSA's invocation of Exemption 3.

[10]        The FBI also invokes Exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *see* Defs.' Opp'n at 23.  As defendants acknowledged in their opposition, Defs.' Opp'n at 23, "[w]hen information is claimed to be exempt from disclosure under both provisions, courts 'focus ... on Exemption 7(C) because it provides broader privacy protection than Exemption 6 and thus establishes a lower bar for withholding material.'" *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Justice*, 854 F.3d 675, 681 (D.C. Cir. 2017) (quoting *CREW I*, 746 F.3d at 1091 n.2).  As a result, Exemption 6 need not be addressed.

plaintiff's sole challenge to the NSD's invocation of Exemption 7(A), which shields law enforcement records the disclosure of which "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  *See* Pl.'s Opp'n at 38–39.

In determining whether records fall within Exemption 7, the D.C. Circuit applies the "law-enforcement-purpose inquiry," which "focuses 'on how and under what circumstances the requested files were compiled,' and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'"  *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 64 (D.C. Cir. 2018) (quoting *Jefferson v. U.S. Dep't of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002)); *see also Eddington v. U.S. Dep't of Justice*, 581 F. Supp. 3d 218, 234 (D.D.C. 2022) ("The term 'law enforcement' encompasses 'the enforcement of national security laws.'" (quoting *Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 862 (D.C. Cir. 1989))).  DOJ, and particularly its components FBI and NSD, "is an agency 'specializ[ing] in law enforcement,' [and so] its claim of a law enforcement purpose is entitled to deference."  *Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003) (quoting, *inter alia*, *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)); *cf. Bartko*, 898 F.3d at 64 (holding that the DOJ's Office of Professional Responsibility, as an office with internal supervisory functions rather than any specialization in law enforcement, merits no deference in its attempts to shield documents under Exemption 7); *Jefferson*, 284 F.3d at 177–78 (same).

Generally, *Glomar* responses issued by law enforcement agencies, including the FBI, satisfy the prerequisite that any responsive records, if they exist, would be investigative in nature.  *See, e.g., Lindsey v. FBI*, 490 F. Supp. 3d 1, 17 (D.D.C. 2020) (holding that the records, if they existed, were compiled for law enforcement purposes upon FBI's declaration that any such records "would logically be investigative in nature"); *Reporters Comm. for Freedom of*

*Press v. FBI*, 369 F. Supp. 3d 212, 220 (D.D.C. 2019) (holding that, where the sought-after records related to a "law enforcement technique…any investigative record related to the use of the technique would necessarily have been compiled for a law enforcement purpose"); *Valdez v. U.S. Dep't of Justice*, 474 F. Supp. 2d 128, 131–32 (D.D.C. 2007) (holding that, given the "descriptions of the [Drug Enforcement Administration] systems of records where responsive records likely would be located, the Court concludes that any responsive records would be law enforcement records").

Defendants' declarations establish a "rational nexus," *Bartko*, 898 F.3d at 64, between DOJ's law enforcement duties and any investigation that may be reflected in responsive records in the agency's possession.  As the FBI declarant affirms, "[t]he only circumstance under which the FBI can request—and the Department of Justice can and would seek on the FBI's behalf—a FISA surveillance order is when the FBI is conducting an authorized, predicated investigation within the scope of its law enforcement and foreign intelligence responsibilities."  FBI Decl. ¶ 47 (citation omitted).  Any records in DOJ's possession would arise in the context of a federal law enforcement investigation.  *See* FBI Decl. ¶ 47; *see also* NSD Decl. ¶ 20 (implying that no responsive records would exist at the Justice Department if NSD did not have any pending investigations related to the subjects of this FOIA request); Defs.' Opp'n. at 24.

Plaintiff criticizes defendants for failing to identify "a connection between the assertedly exempt records and an inquiry into a possible security risk or violation of federal law."  Pl.'s Reply at 24 (quoting *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017)).  To be sure, an agency should normally "be able to identify a particular individual or a particular incident as the object of its investigation and the connection between that individual or incident and a possible security risk or violation of federal law." *Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982).

Yet, in the context of a *Glomar* response by an agency specializing in law enforcement and entitled to deference, the requirement that the agency show that the records, of which it cannot confirm the existence, concern a particular individual or incident does not apply.  *See, e.g., Lindsey*, 490 F. Supp. 3d at 16–17 (deferring to FBI declaration in the context of a *Glomar* response, without requiring a specific showing about the connection between an "individual or incident" and violation of law). The only case that plaintiff cites purportedly to the contrary is *Bartko v. U.S. Dep't of Justice*, but this case is inapposite because the DOJ component that issued the *Glomar* response at issue found to be insufficient in "showing on a case-by-case basis that any requested records were actually compiled for law-enforcement, rather than [other], purposes" did not specialize in law enforcement—unlike NSD and FBI.  898 F.3d at 65.

DOJ has met its threshold burden of showing that the records at issue were compiled for law enforcement purposes.  For the same reason, absent other arguments from plaintiff, NSD's invocation of Exemption 7(A) is appropriate.[11]  The FBI's remaining two invocations of Exemption 7 are discussed next.

### 1.    *Exemption 7(C)*

"Under Exemption 7(C), 'records or information compiled for law enforcement purposes' may be withheld 'to the extent that' disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy.'"  *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting 5 U.S.C. § 552(b)(7)(C)).  "Where the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the

---

[11]    Plaintiff does not challenge whether NSD "demonstrate[d] that disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *CREW I*, 746 F.3d at 1096 (citation omitted).  NSD explains that the disclosure of FISA surveillance-derived records would permit "hostile intelligence services…to acquire information about United States intelligence investigations," NSD Decl. ¶¶ 15–18, which is sufficient to support invocation of the exemption. *See Buzzfeed, Inc. v. Dep't of Justice*, 344 F. Supp.3d 396, 403–05 (D.D.C. 2018) (finding Exemption 7(A) justified withholding where details of surveillance techniques would tip off individuals involved in criminal activity as to ways to avoid detection).

information to establish a sufficient reason for the disclosure . . . [by] show[ing] that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake . . . [and that] the information is likely to advance that interest." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004); *see also Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 893 (D.C. Cir. 1995) ("The courts have construed [Exemption 7(C)] as permitting exemption if the privacy interest at stake outweighs the public's interest in disclosure."). The relevant public interest for purposes of this balancing "focuses on the citizens' right to be informed about 'what their government is up to,'" which includes "[o]fficial information that sheds light on an agency's performance of its statutory duties." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989).

The privacy interests at issue held by the 48 named individuals is not trivial. The D.C. Circuit has recognized the "'substantial' privacy interest held by 'the targets of law-enforcement investigations . . . in ensuring that their relationship to the investigations remains secret.'" *People for the Ethical Treatment of Animals*, 745 F.3d at 541 (quoting *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011). *See also Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (holding it "beyond dispute that 'the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation,'" even when that individual is not the investigation's target (quoting *Branch v. FBI*, 658 F. Supp. 204, 209 (D.D.C. 1987))).

Plaintiff fairly describes the named individuals to be "nationally prominent public-office holders," whose privacy interests may be diminished in certain contexts by dint of their public office. Pl.'s Opp'n at 37. Indeed, the D.C. Circuit has held "that public officials 'may have a somewhat diminished privacy interest' in the Exemption 7(C) balancing analysis." *Elec. Privacy*

*Info. Ctr. v. U.S. Dep't of Justice*, 18 F.4th 712, 719 (D.C. Cir. 2021) (quoting *CREW I,* 746 F.3d at 1092). Nevertheless, "public officials do not surrender all rights to personal privacy when they accept a public appointment." *CREW I,* 746 F.3d at 1092 (quoting *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996)) (cleaned up).

Correctly weighing the public interest in disclosure here is more a more vexing undertaking. "[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174; *see also Elec. Privacy Info. Ctr.*, 18 F.4th at 718. Plaintiff's evidence for the impropriety it seeks to ferret out via FOIA requests—the "potential abuse of [the intelligence community's] surveillance powers against its congressional overseers," Pl.'s Reply at 25—consists of public reporting that lawmakers' identities are frequently unmasked in intelligence reports without the lawmakers being informed, as well as reports of spying on intelligence committee members in an unrelated context. The problem with plaintiff's evidentiary showing is merely because members of Congress's identities are unmasked in intelligence reports does not mean that the intelligence community is engaging in abuse. *See* Defs.' Opp'n at 26. As plaintiff concedes, this type of unmasking is governed by long-existing policy guidelines. *See* Pl.'s Resp. SMF, at ¶¶ 21-41. Plaintiff attempts to bridge this gap by alleging that the "frequency of such undisclosed surveillance indicates that unmaskings may have been requested for illegitimate reasons." Compl. ¶ 23. Even recognizing that plaintiff finds itself in a catch-22—in which sufficient evidence is lacking of governmental misconduct to

justify obtaining any such evidence—this is too slim a reed to "warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174. Plaintiff has failed to advance anything more than speculation that the requested records would serve the public interest of monitoring potential abuses by the intelligence community.  As a result, the balance of the named lawmakers' privacy interest outweighs the public interest in disclosure, meriting the protection of Exemption 7(C).

## 2.     *Exemption 7(E)*

Finally, to earn the protection of Exemption 7(E), the FBI must demonstrate that acknowledgement of the existence or non-existence of the law enforcement records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  "Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'" *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)) (alteration in original).

The FBI explains that, although the existence of surveillance under FISA is undeniably public information, the existence of records linking that surveillance to particular individuals is an entirely different matter.  "Acknowledging when and under what circumstances the FBI relies upon this authorized law enforcement technique would provide targets and other adversaries with insight into the activities likely to attract—or not attract—the FBI' s attention.  Individuals and

adversaries would then be able [to] alter their behavior to avoid attention by law enforcement, making it more difficult for the FBI to be proactive in assessing and investigating national security threats."  FBI Decl. ¶ 50.  Foreign intelligence officers and other adversaries that have communicated with the lawmakers referenced in the FOIA requests at issue would learn whether those communications were subject to covert surveillance—and likely alter their behavior accordingly—if the agency were to confirm whether the requested records exist.  *See* Defs.' Mem. at 24.

Plaintiff dismisses the FBI's articulated concern, arguing that revealing the existence of unmasking or upstreaming records "rings hollow in the face of the ODNI's…express rationale for disclosing details related to the unmasking of Michael Flynn."  Pl.'s Opp'n at 40.  In Grenell's disclosure of the identities of those officials who requested Flynn's unmasking, he wrote that the disclosure posed "absolutely no risk" to national security.  *Id.* (quoting Grenell Letter at 1).  Plaintiff rehashes its search-based argument that, "[i]f actual disclosure of surveillance records can be 'absolutely' safe, then clearly it is possible to merely *search* for responsive records without triggering the harms the FBI vaguely invokes."  Pl.'s Opp'n. at 40 (emphasis in original); *see also* Pl.'s Reply at 27–28.

These arguments against applicability of Exemption 7(E) are unavailing.  For the reasons stated, *see supra* § III.A, plaintiff's contention that the FBI must search for responsive records before issuing a *Glomar* response is foreclosed by D.C. Circuit precedent.  Further, the FBI has adequately demonstrated that confirming the existence or non-existence of the particular records sought by the plaintiff "could risk 'circumvention of the law.'"  *Mayer Brown*, 562 F.3d at 1190 (quoting 5 U.S.C. § 552(b)(7)(E)).  That the unmasking and upstreaming of lawmakers' identities generally is "publicly known," as plaintiff contends, does not undermine the risk

created by acknowledging whether the FBI maintains records concerning the unmasking or upstreaming of the *particular* 48 individuals named in plaintiff's FOIA requests. *See also Buzzfeed, Inc. v. Dep't of Justice*, 344 F. Supp. 3d 396, 407 (D.D.C. 2018) (distinguishing the public's awareness that the FBI uses aerial surveillance from the FBI's confirmation that it does or does not use specific aircraft). Exemption 7(E) is satisfied as an alternative basis for the FBI's *Glomar* response.

## IV.   CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment, ECF No. 11, is **GRANTED**, and plaintiff's cross-motion for summary judgment, ECF No. 15, is **DENIED**.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: September 19, 2022

_____
BERYL A. HOWELL
Chief Judge